**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| ELSIE E. DOMINGUEZ, | ) | |
| *Plaintiff*, | ) | |
| v. | ) | COMPLAINT |
| | ) | JURY TRIAL DEMANDED |
| UNITED STATES OF AMERICA, | ) | Index No. |
| *Defendant*. | ) | |

**COMPLAINT**

Plaintiff, Elsie E. Dominguez, by and through her undersigned counsel, hereby sues Defendant the United States ("Defendant"), and in support thereof, states as follows:

**INTRODUCTION**

1. In October 2021, Elsie E. Dominguez, a high-performing graduate of the United States Merchant Marine Academy, began working as a civilian 1st Assistant Engineer on the *USNS Carson City*, a United States Navy vessel. Ms. Dominguez had worked hard to reach this position, an accomplishment achieved by very few female mariners. However, her dream job quickly turned into a nightmare when on December 19, 2021, she awoke to find the Captain of the *USNS Carson City* ("the Captain"), raping her in her own bed aboard the vessel.

2. By this Complaint, Ms. Dominguez seeks justice for the sexual assault that she endured aboard the *USNS Carson City*, and for the failure of the United States to care for her or protect her when she reported the attack the next morning using the proper reporting procedures.

3. By bringing this suit under her own name, at great personal and professional risk, Ms. Dominguez seeks to help prevent other civilian mariners and service members from having to endure the same horror that she experienced while serving aboard the *USNS Carson City*.

4. For the failure of the United States to protect Ms. Dominguez from sexual assault, she seeks all remedies available to her under law.

## JURISDICTION AND VENUE

5. These admiralty and maritime claims are brought against the United States under the Suits in Admiralty Act, 46 U.S.C.A. § 30901 et seq., and the Public Vessels Act, 46 U.S.C.A. § 31101 et seq., through which the United States has waived sovereign immunity.

6. This Court has subject matter jurisdiction over the case pursuant to the Jones Act (46 U.S.C. § 30104) under a theory of negligence, and under the General Maritime Law and the Admiralty jurisdiction of the United States under 28 U.S.C. § 1333 for a theory of unseaworthiness.

7. Venue is proper under the Suits in Admiralty Act, 46 U.S.C.A. § 30906, and the Public Vessels Act, 46 U.S.C.A. § 31104, as these claims are brought in the district court of the United States in which the plaintiff, Ms. Dominguez, resides. Defendant United States of America is subject to personal jurisdiction in this district.

8. Ms. Dominguez has complied with all administrative claim prerequisites. Plaintiff submitted a written claim for the damages alleged in this complaint to the federal government. The written claim was received by the federal government on or before June 16, 2023. The written claim was denied by the federal government on July 17, 2023.

## PARTIES

9. Plaintiff Elsie E. Dominguez is a citizen and resident of the state of New Jersey, in Somerset County. At all relevant times herein, Ms. Dominguez was employed as a civilian federal

employee by the U.S. Navy's Military Sealift Command ("MSC"). Ms. Dominguez served as a civilian mariner aboard the *USNS Carson City* from October 2021 to October 21, 2023.

10. Defendant United States of America, through the United States Navy's Military Sealift Command, owns and controls the *USNS Carson City*.

11. MSC is an organization that controls the replenishment and military transport ships of the United States Navy. MSC has its principal headquarters in Norfolk, Virginia. MSC ships are owned by the United States Navy and provide sealift and ocean transportation for all United States military services as well as for other United States government agencies.

12. The United States Navy, the maritime service branch of the United States Armed Forces and a part of the Department of the Navy, has its principal headquarters in Washington, DC. The United States Navy is charged with defense of the country at sea, the seaborne support of the other U.S. military services, and the maintenance of security on the seas wherever the interests of the United States extend.

13. Defendant, United States of America, is and was at all times material to this cause, a sovereign that has consented to be sued herein and was responsible for the actions of MSC, the United States Navy, and its agents, servants, and employees.

## **FACTUAL ALLEGATIONS**

14. Ms. Dominguez graduated from the United States Merchant Marine Academy at Kings Point, New York in 2014. Ms. Dominguez graduated with a Bachelor of Science degree in Marine Engineering. After graduation, Ms. Dominguez excelled professionally and rose through the civilian ranks within Military Sealift Command from 3rd Assistant Engineer to 1st Assistant Engineer, an accomplishment achieved by very few female mariners. In 2015, Ms. Dominguez was awarded a Coast Guard Meritorious Team Commendation for her service in support of

Operation Junction Rain, the capstone event for the African Maritime Law Enforcement Partnership, while onboard the *USNS Spearhead*. Throughout the course of her career, Ms. Dominguez has made time to give back through developing training courses and curricula for others seeking to follow a path of maritime public service. By all accounts, prior to the sexual assault, Ms. Dominguez had a promising career in a male-dominated field.

### A. **Ms. Dominguez was Sexually Assaulted While Serving Aboard the *USNS Carson City***

15. On November 14, 2014, Ms. Dominguez was assigned as a 3rd Assistant Engineer to her first MSC assignment aboard the *USNS Spearhead*. While there, she met the Captain, who was then working as the 2nd Mate.

16. While aboard the *Spearhead* in 2014 and 2015*,* Ms. Dominguez had a cordial and friendly relationship with the Captain. On one occasion when the ship was docked in Little Creek/Virginia Beach, Virginia, Ms. Dominguez went ashore with the Captain to ride bicycles to the beach. On another occasion while the *Spearhead* was docked in Little Creek, Ms. Dominguez joined the Captain at a restaurant for a meal. Those are the only two notable personal interactions that Ms. Dominguez had with the Captain during that time. At no time while assigned to the *Spearhead* in 2014 and 2015 did Ms. Dominguez have any romantic or sexual interactions with the Captain. After departing the *Spearhead*, Ms. Dominguez did not communicate with the Captain for more than three years, other than exchanging a couple of cordial social media messages.

17. On October 15, 2021, Ms. Dominguez joined the *USNS Carson City* as a 1st Assistant Engineer for MSC in Malaga, Spain. Upon Ms. Dominguez's arrival, she learned that the Captain was serving onboard as the Master of the vessel.

18. One night while at sea, during her first month aboard the *USNS Carson City,* the Captain invited Ms. Dominguez to his stateroom to watch a movie. The Captain told Ms.

Dominguez that he had no one else on the ship to talk to or hang out with and told her that he needed Ms. Dominguez to be that person for him. In addition, he told Ms. Dominguez how much he appreciated their "friendship."

19. Later that same night, the Captain began initiating sex with Ms. Dominguez. Ms. Dominguez was shocked because the Captain was her boss and the Master of the ship. As a result, she did not feel like she could tell him to stop. The experience was demeaning and upsetting for Ms. Dominiguez.

20. As soon as it was over, the Captain proceeded to ask Ms. Dominguez if she wanted to cuddle with him and sleep in his room that night, to which Ms. Dominguez responded with an emphatic "no." Before leaving his stateroom, Ms. Dominguez told the Captain that she did not enjoy the encounter and did not wish to have any kind of romantic or sexual interactions with him moving forward. Ms. Dominguez then returned to her own stateroom alone.

21. After that night, the Captain frequently invited Ms. Dominguez to return to his stateroom to "hang out" with him in an attempt to establish an ongoing sexual relationship with her. However, Ms. Dominguez always declined these invitations. She had made it clear that she was uncomfortable with their one sexual interaction and had no desire to ever have a sexual or intimate encounter with him again.

22. Ms. Dominguez was also wary of having any personal relationship with the Captain because of his well-known reputation for excessive alcohol consumption. The crew members knew that the Captain had an active drinking problem and was habitually drunk aboard the ship. It was also well known among the crew that usually when the Captain went ashore, he was going to get very intoxicated.

23. In addition, Ms. Dominguez was concerned because the Captain had unfettered access to her stateroom. Rather than having a key lock and a system of monitored master keys, Ms. Dominguez's stateroom had a keypad lock. The Captain possessed the master code to Ms. Dominguez's stateroom door and could therefore enter her stateroom whenever he wished.

24. While Ms. Dominguez continued to fend off the Captain's unwelcome sexual invitations, the Captain escalated his conduct when the *USNS Carson City* was docked in Brindisi, Italy on December 18, 2021.

25. After work on December 18th, around 7 PM local time, the Chief Engineer and Ms. Dominguez went ashore in Brindisi to a bar. When they arrived, they were the only crew members present.

26. The Chief Engineer and Ms. Dominguez each ordered a beer, which Ms. Dominguez slowly sipped as they chatted.

27. Soon after, the ship's First Officer and the Captain arrived and joined the Chief Engineer and Ms. Dominguez. At some point after their arrival, a round of shots was ordered for the group. Ms. Dominguez took only one shot of liquor.

28. Ms. Dominguez's last recollection of the events that occurred ashore on the evening of December 18, 2021, is of her taking that one single shot of liquor with her colleagues. After consuming the shot of liquor, Ms. Dominguez became incapacitated and blacked out. Ms. Dominguez was far more intoxicated than would be expected since she had only one shot and part of one beer. Ms. Dominguez had never before become incapacitated from such a small amount of alcohol. Upon information and belief, Ms. Dominguez believes that someone drugged her shot of liquor, which rendered her incapacitated. Ms. Dominguez later learned that she was so intoxicated that after leaving the bar with her shipmates and entering a restaurant to have dinner, she vomited

on herself at the restaurant. Ms. Dominguez was so incapacitated that she has no memory of being inside the restaurant with her shipmates.

29. Although Ms. Dominguez does not have any memory of returning to the *USNS Carson City* that night, she later learned that the Chief Mate helped her back to the ship, where he and the Mate on Watch carried her to her stateroom, put her into her bed, closed her stateroom door, and left her there alone and unconscious.

30. According to her WhatsApp chat log, at approximately 11:09 PM local time on December 18, 2021, while Ms. Dominguez was incapacitated, the Captain began to text and call Ms. Dominguez via WhatsApp.

31. "*Don[d]e estás amor"* ["Where are you, love"] the Captain asked her in his first message. When Ms. Dominguez did not respond, the Captain began to call her. Within the span of approximately 1.5 hours (between 11:11 PM on December 18, 2021 and 00:40 on December 19) the Captain called Ms. Dominguez at least 14 times. According to her WhatsApp chat log, Ms. Dominguez did not answer any of his calls. At approximately 00:16 on December 19, the Captain texted, "*Me voy decepcionada. Una noche contigo era mi deseo…"* [I'm leaving disappointed. A night with you was my wish…]. Ms. Dominguez, who was incapacitated and not in possession of her phone, did not respond to any of the Captain's messages.

32. At approximately 00:40 on December 19, the Captain sent Ms. Dominguez a final message: "*Una persona débil"* ["(You are) a weak person"], he wrote to her. Ms. Dominguez again did not respond. At some point in the early morning of December 19, after calling Ms. Dominguez at least 14 times, texting her that he wanted to spend the night with her, and then calling her "*a weak person*," the Captain returned to the vessel and used his MSC-issued master code to enter Ms. Dominguez's stateroom where she was asleep and incapacitated.

33. Ms. Dominguez's next memory is the horrifying image, sensation, and realization of someone penetrating her vagina with his penis while pinning her arms down. Ms. Dominguez quicky realized that the Captain was raping her, yet she was so incapacitated that she was unable to control her body, her speech, or her movements. At one point, Ms. Dominguez recalls losing control of her bladder and urinating all over the Captain and the bed. As he raped her, the Captain told Ms. Dominguez that she was the "love of his life."

34. Ms. Dominguez did not consent to having sex with the Captain. Due to her extreme incapacitation, she was incapable of consenting and struggled to even maintain consciousness.

35. After the Captain finished raping Ms. Dominguez, he violently pushed her towards the bulkhead that bordered her bed. Ms. Dominguez's body hit the bulkhead forcefully, and she collapsed, face down, between the bulkhead and the Captain. The Captain then lay on top of Ms. Dominguez until he fell asleep. Ms. Dominguez, who continued to struggle to maintain consciousness, again passed out.

36. When Ms. Dominguez regained consciousness, the Captain was asleep and still laying on top of her. Ms. Dominguez began attempting to push him off of her body. In doing so, the Captain fell off the bed and onto the floor.

37. Ms. Dominguez then began to angrily yell at the Captain and asked him what he was doing in her room. As the Captain stood at the side of her bed, he repeated several times variations of, "*amor de mi vida, que te pasa? Por que [me] tratas asi. Amor calmate*" ["love of my life, what's wrong with you? Why are you treating me like this. Calm down, my love"]. When Ms. Dominguez continued to grow agitated, the Captain began to shout obscenities at Ms. Dominguez, such as repeatedly shouting "*eres una persona debil, eres una puta*" ["you are a weak person, you are a slut"].

38. The Captain then got dressed and walked out into the passageway where he continued to yell at Ms. Dominguez.

39. Once the Captain left her room, Ms. Dominguez summoned the strength to stand up. She felt dizzy and disoriented, had a throbbing headache, and was extremely thirsty. These extreme physical symptoms strengthened her belief that she had been drugged.

40. Ms. Dominguez tried to remember the details of the night but could not remember anything after taking the one shot and then waking up to the Captain raping her. By this time, it was approximately 6 AM on December 19, 2021.

41. Ms. Dominguez noticed the Captain's plastic Nalgene water bottle lying on the floor next to her bed. Ms. Dominguez also saw the Captain's underwear, his black sweatpants, and a jacket that she did not recognize.

42. Later that morning, the Chief Mate of the *USNS Carson City* came by Ms. Dominguez's stateroom, which also served as her office. The Chief Mate asked Ms. Dominguez if she was okay. He then told Ms. Dominguez that, the night before, she began acting very strangely at the restaurant and he became concerned about her.

43. Ms. Dominguez told the Chief Mate that she had no memory of being at the restaurant he was referencing – a place different from the bar where she started her night ashore. The Chief Mate told Ms. Dominguez that she vomited on herself at the table in the restaurant before the food even arrived. Concerned for her safety and wellbeing, the Chief Mate told Ms. Dominguez that he called a driver and brought her back to the ship by himself.

44. Ms. Dominguez told the Chief Mate that she had no memory of coming back to the ship with him. Ms. Dominguez then asked the Chief Mate if he took her all the way back to her room. The Chief Mate responded that, in the car on the way back to the ship, he called the ship's

Navigator who was serving as the Mate on Watch and asked him to meet on the pier at the bottom of the gangway, because the Chief Mate thought he would need another person to help bring Ms. Dominguez safely up the gangway.

45. The Chief Mate told Ms. Dominguez that he and the ship's Navigator had carried Ms. Dominguez up the gangway and to her stateroom, where they put her in her bed, left her alone in her stateroom, and closed the door.

46. At approximately 8 AM, following the rape, Ms. Dominguez saw the ship's Navigator who jokingly said to Ms. Dominguez something to the effect of, "it seems like you had a wild night last night." In response, Ms. Dominguez told him that she had no recollection of most of the night and asked him to explain what he witnessed.

47. The Navigator told Ms. Dominguez that he had helped the Chief Mate carry her up the gangway, and that she was in a helpless state, unable to walk on her own, unable to speak, and unconscious. The Navigator also mentioned that if he had not been there to assist Ms. Dominguez back to her room, she would have face planted on the deck of the *USNS Carson City*. The Navigator confirmed that he and the Chief Mate had carried Ms. Dominguez into her room, put her in her bed, then closed the door to her room and left her alone.[1] Ms. Dominguez was shocked to hear that her colleagues had left her alone in such a helpless state, especially given the risk that she could have vomited and asphyxiated at her level of incapacitation.

48. Mid-morning, Ms. Dominguez walked into the Chief Engineer's office and asked him questions about the night before. She informed the Chief Engineer that she could not

[1] The sign-out/sign-in sheet for the *USNS Carson City* from December 18, 2021 is missing, though the sign-out/sign-in sheets from December 17, 2021 and December 19, 2021 are still in the ship's records.

remember much from the night before, that she only remembered drinking one shot and less than one beer, and that she felt horrible, dizzy, thirsty, and disoriented.

49. Ms. Dominguez also notified the Chief Engineer that she believed she had been given a date rape drug at the bar the night before, and that she wanted to go into town and have a drug test administered. However, the Chief Engineer strongly discouraged Ms. Dominguez from being tested for a date rape drug. He told Ms. Dominguez that it would be a waste of her time and efforts to get a drug test because, he told her, date rape drugs are no longer detectable a few hours after ingestion. The Chief Engineer also told her that he had been drugged twice before in his lifetime, and he knew from experience that she would be okay after some rest and hydration.

50. Ms. Dominguez was troubled by the Chief Engineer's response, but Ms. Dominguez felt that without her boss' support she could not press the issue. Furthermore, considering the circumstances, going to the Captain and asking for his permission to take leave for a drug test was not a viable option.

51. At lunchtime, Ms. Dominguez tried to lay down on her bed and realized her bed was wet. Ms. Dominguez leaned in to smell the wet spot on her mattress and confirmed that it was urine. Ms. Dominguez then pulled out the shirt she had on the night before and found it completely covered in vomit.

52. Distraught and traumatized, Ms. Dominguez went to the Captain's office and confronted him. She told him that he had drugged and raped her. In response, the Captain grew angry and yelled "what you don't remember the sex?"

53. Ms. Dominguez responded, "of course not! I was drugged and didn't want to have sex with you, why would you have sex with someone who is unconscious, with vomit all over her

clothes – you raped me!" The Captain then claimed that he had also been drugged and therefore could not be responsible for his actions. He then began crying.

54. When Ms. Dominguez told the Captain that she wanted a drug test conducted onboard the vessel, the Captain's tone became threatening. The Captain said that it would be a red flag to get drug tested at work and that Ms. Dominguez would probably get pulled off the ship as a result. He further threatened that, as the Master of the vessel, he would need to report that a crew member was requesting a drug test and drug use is prohibited by MSC and the United States Coast Guard. The Captain mentioned that all of the ship's drug tests were sent into a specific contracted lab and the test would be required to be sent in as an MSC sample, not just a drug test in her own name.

55. Ms. Dominguez believed that the Captain was deliberately threatening to derail her career and weaken her professional standing if she pursued medical testing and treatment. In fear of losing her job, Ms. Dominguez left the Captain's office and did not take the drug test or seek any additional treatment, such as a rape exam.

56. Because her superiors on the ship were unwilling to assist Ms. Dominguez, Ms. Dominguez decided to follow MSC's reporting policies to formally report the rape. Upon information and belief, MSC had failed to post information about its "Sexual Assault Prevention and Response ("SAPR") Program" aboard the *USNS Carson City* in a manner that was adequately accessible to crew members.

57. In the absence of posted guidance aboard the ship, Ms. Dominguez searched for information online about how to report the rape. Ms. Dominguez found information on MSC's website about her options of both "unrestricted reporting," which "is recommended for victims of sexual assault who desire an official law enforcement investigation and command notification,"

and "restricted reporting," which allows a victim to report the rape and receive treatment and counseling without immediately triggering an official law enforcement investigation and command notification. The website advised that victims should report to MSC's Sexual Assault Response Coordinator or SAPR Victim Advocate "[t]o ensure maximum confidentiality."[2]

58. Ms. Dominguez found the phone number for the MSC SAPR 24/7 crisis line and understood that calling this number was the proper protocol for her to report a sexual assault. Therefore, on the afternoon following the rape, she called MSC's sexual assault helpline.

59. When Ms. Dominguez reached the Civilian Advocate at the helpline, she reported the details of the rape and the fact that the rapist was the Captain. She also told the Civilian Advocate that she wanted to make a "restricted report."

60. Whereas any information provided to the MSC chain of command via a restricted report is not supposed to reveal personally identifying information of the victim, Ms. Dominguez knew that an unrestricted report was not confidential. Ms. Dominguez believed that making a restricted report was the only way to create a formal record of her sexual assault, protect her identity, and ensure her safety aboard the *USNS Carson City* until she felt strong enough and safe enough to move forward with an unrestricted report of her rape. In addition, Ms. Dominguez feared retaliation that would damage her career if she made an unrestricted report of sexual assault against an MSC Captain without her own legal counsel to protect her.

61. When Ms. Dominguez reached MSC's Civilian Victim Advocate via the helpline on the afternoon following the rape, she told the Civilian Victim Advocate that she wanted to make a restricted report. The Civilian Victim Advocate then informed Ms. Dominguez that because she

---

[2] *See* Sexual Assault Prevention and Response, U.S. Navy's Military Sealift Command, https://www.msc.usff.navy.mil/Organization/Headquarters/MSC-SAPR/ (last visited Nov. 21, 2023).

was a civilian employee, she was not eligible to make a restricted report of sexual assault to MSC, and her only option was unrestricted reporting. When Ms. Dominguez pleaded to be allowed to make a restricted report, the Civilian Victim Advocate again refused to allow Ms. Dominguez to make a restricted report.

62. While Ms. Dominguez was considering the implications of unrestricted reporting, the Civilian Victim Advocate warned Ms. Dominguez that if she made an unrestricted report, she would be immediately removed from her position as 1st Assistant Engineer aboard the *USNS Carson City* and then flown from Italy back to the United States where she would be interviewed by federal law enforcement agents and forced into a highly public process. The Civilian Victim Advocate also told Ms. Dominguez that after she was removed from the vessel, she would not be allowed to return to work for MSC until the law enforcement investigation was completed, which could take more than one year. When Ms. Dominguez told the Civilian Victim Advocate that the process she was describing sounded like she was going to lose her job for reporting a rape, the Civilian Victim Advocate told her that was correct.

63. At that point, less than 24 hours had elapsed since Ms. Dominguez had been violently raped in her own bed. In pain, and fearing for her personal safety, her professional reputation, and her economic livelihood, Ms. Dominguez did not feel safe making an unrestricted report at that time. However, MSC did not offer the option of restricted reporting to Ms. Dominguez, or to any other civilian sexual assault victims.

64. The next day, Ms. Dominguez again reached out to the Civilian Victim Advocate. Ms. Dominguez again asked about making a restricted report, and inquired about any other available options for reporting that would not lead to her immediately losing her job and her economic livelihood. The Civilian Victim Advocate reaffirmed what she had told Ms. Dominguez

the day before, and told her there was nothing else they could do for her unless she proceeded with an unrestricted report.

65. On December 20, 2021, shortly after the Captain raped her and following an encounter in which Ms. Dominguez confronted him in person and accused him of rape, the Captain acknowledged his culpability. In a WhatsApp message sent to Ms. Dominguez, the Captain wrote, "*I am so embarrassed by what I did to you that I do not even have the strength to see you face to face. . . I hope that someday you can forgive me. You have a very special place in my heart and I appreciate you very much. Perhaps more than I should. I wish you the best.* [translated from Spanish]".

66. Unable to obtain help from anyone on the ship or from MSC's designated sexual assault response professional, Ms. Dominguez felt extremely unsafe aboard the *USNS Carson City*—a feeling that was made worse by having to continue sleeping in the same bed where she had been raped. Ms. Dominguez's fears were also exacerbated by the knowledge that the Captain had unfettered access to her room. Attempting to protect herself, she slept with a chair wedged against her door to prevent the Captain from entering her stateroom. Ms. Dominguez also filled out a work order to have a deadbolt installed on the inside of her stateroom door on December 20, 2021. On the work order, Ms. Dominguez documented her reason for the request: "Door unable to lock from the inside. From the outside there is a key pad with programmable options to include a master code. Requesting deadbolt be installed as a safety measure, for use when space is being occupied." Despite the threat to safety evident in the work order, nobody followed up with Ms. Dominguez.[3]

[3] The deadbolt Ms. Dominguez requested was not installed until August 2022. The female employee ("the Bosun") who came to install the deadbolt said to Ms. Dominguez something to the effect of: "I know why you need this. We should all have them." The Bosun wrote in the close out

67. Ms. Dominguez texted MSC's Civilian Victim Advocate to report the extreme measures she had to take to feel safer on the ship; however, the Civilian Victim Advocate did not respond to any of Ms. Dominguez's numerous texts. It would not be until June of 2023, approximately 1.5 years later—soon after Ms. Dominguez reported the crime to MSC, the Naval Criminal Investigative Service (NCIS), and the U.S. Coast Guard Investigative Service (CGIS)—that the Civilian Victim Advocate finally responded to Ms. Dominguez via email.[4]

68. In the days following the rape, the Captain and Ms. Dominguez had several in-depth conversations about the rape. During these highly emotional conversations, the Captain cried, admitted to having raped her, and told Ms. Dominguez that if she reported him for the rape, he would lose his family and his career. This psychological manipulation by the Captain caused Ms. Dominguez tremendous additional pain and confusion about how she should proceed. Furthermore, Ms. Dominguez felt helpless because her prior attempts to report the rape had been met with indifference and opposition.

69. Ms. Dominguez lived in fear until a few days after the rape, when the Captain departed the vessel on routine leave and returned home for the holidays. After the Captain departed, Ms. Dominguez stayed on the ship.

70. Ms. Dominguez's reprieve was short lived, however, because on or about April 2022, the Captain returned from leave and resumed his duties as master of the *USNS Carson City*.

---

notes the reason that Ms. Dominguez wanted the deadbolt installed: "Door unable to be locked while inside sleeping." Yet, again, while official documentation clearly demonstrated that Ms. Dominguez felt unsafe sleeping in her own bed while aboard the *USNS Carson City*, nobody followed up with Ms. Dominguez about the reason for her fear.

[4] The Civilian Victim Advocate began the June 2023 email by introducing herself and her role, as though she had not previously communicated with Ms. Dominguez. She further said: "*I'm very sorry about the circumstances. Although you didn't file a report with our office, I would still like to ensure you have full support through this endeavor*." To Ms. Dominguez, the email felt like the intentional gaslighting of a sexual assault victim.

The Captain's return to the vessel was highly distressing to Ms. Dominguez, as she found herself yet again trapped aboard the vessel with her attacker, who was also her boss, her commanding officer, and the master of the *USNS Carson City*.

71. From June 6 to August 5, 2022, the *USNS Carson City* docked in a shipyard in Rijeka, Croatia. The Captain and Ms. Dominguez were both aboard the vessel in the shipyard. While in the shipyard, the Captain began to drink excessive amounts of alcohol on a daily basis. Although the Captain was known to drink heavily, during this time, he consumed even more alcohol than usual and frequently did not show up for work. The Captain's drunken behavior was so well known that the Port Engineer would often comment that the Captain was "at it again."

72. As his alcohol consumption increased, the Captain began having frequent anger fits towards Ms. Dominguez and other crew members. Many of the officers onboard made comments about the drunken screams they would hear at night coming from the Captain's stateroom. In addition, upon information and belief, officials on shore, including the Port Captain, Port Engineer, and Class Manager—all high-ranking MSC employees—also commented on the Captain's frequent intoxication.

73. During this time, the Captain also became increasingly paranoid that Ms. Dominguez was going to report that he had raped her. In approximately August 2022, as Ms. Dominguez was preparing to depart the ship on leave, the Captain attempted to convince Ms. Dominguez to keep the rape a secret. He promised her that if she kept it quiet, he would give up his position on the *USNS Carson City* so that Ms. Dominguez could return to the vessel without having to work with him.

74. The Captain also knew that Ms. Dominguez wanted to stay in the Expeditionary Platform Fast ("EPF") fleet. Accordingly, the Captain also promised Ms. Dominguez that he would

request to return to the "Big Fleet" and would no longer work on any EPF ships. The understanding between them was that if he did this, and stayed away from Ms. Dominguez, she would not follow-up on her initial attempts to report him for raping her. Given the numerous obstacles that Ms. Dominguez had already faced in trying to report the rape, and her desire to continue building her career away from the constant harassment and psychological torment of her rapist, Ms. Dominguez felt that agreeing to the Captain's terms was her only option.

75. However, in March 2023, the *USNS Carson City*'s relief Captain, who was preparing to depart the vessel on leave, announced to the crew that the permanent Master – the Captain – would soon be returning to the vessel to replace her. At that point, Ms. Dominguez began to experience waves of panic, anxiety, and dread. She also realized that the Captain had not only raped her, but had lied to her about not returning to her ship, and felt no remorse for his actions.

76. By mid-May of 2023, the Captain returned to *USNS Carson City* in Croatia and he resumed official command of the *USNS Carson City* on approximately May 18, 2023.

77. Ms. Dominguez was not scheduled to depart the ship until October 21, 2023. However, seeing her rapist every day until her scheduled departure felt like unbearable torture. Unable to take the stress and fear of being around the Captain, Ms. Dominguez reported the rape to the Navy's Office of the Judge Advocate General and MSC's Office of Counsel, as well as to the NCIS and CGIS in June 2023. The NCIS and CGIS both opened criminal investigations, and NCIS agents based in Italy flew to Croatia to interview Ms. Dominguez. Upon receiving her report of rape, MSC officials removed the Captain from the vessel and flew him back to MSC headquarters in the United States before he could be interviewed by NCIS agents. Rather than taking any concrete steps to address what happened to Ms. Dominguez or to hold the Captain

accountable, the Navy has protected the Captain, shielded him from scrutiny, and continued to employ him.

78. On October 21, 2023, Ms. Dominguez disembarked from the *USNS Carson City*. Since returning to the United States, Ms. Dominguez has moved to New Jersey to be closer to her parents while recovering from her horrific experience aboard the *USNS Carson City*. Because of the trauma she endured, Ms. Dominguez does not know when she will be ready to seek placement on another vessel.

**B. The Sexual Assault Ms. Dominguez Experienced was Foreseeable**

79. Ms. Dominguez's attack was entirely foreseeable to the Defendant. The Captain is widely known for his reputation for alcohol abuse. In fact, he is frequently referred to by a nickname referencing a crude sex act because of his bad behavior when intoxicated. This reputation existed well before Ms. Dominguez's voyage on the *USNS Carson City*. Upon information and belief, his reputation was widely known not only by the crew members of the vessel, but also by high-ranking officials in MSC and the Navy, including the Port Captain, the Port Engineer, the Class Manager, and the Military Officer in Charge.

80. Upon information and belief, the Captain was known for his dangerous propensity to abuse alcohol as early as 2014, when he was a Second Mate. This well-known propensity continued when he became captain and master of the *USNS Carson City*. In fact, on days the ship was in port, the Captain would frequently return to the *USNS Carson City* intoxicated. It was well known that, as a result, he regularly experienced blackouts, and was frequently sequestered in his room during work hours due to the resulting hangovers.

81. Upon information and belief, the Captain also routinely consumed alcohol aboard the vessel despite clear regulations against such conduct. Frequently, crew members would be

unable to reach the Captain and would have to bang on his stateroom door to try to rouse him from his drunken state. Crew members also noticed that, at times, the Captain smelled heavily of alcohol. In addition, crew members routinely heard the Captain screaming, throwing things, and engaging in drunken anger fits while in his stateroom.

82. The Department of the Navy maintains clear instructions regarding the possession and consumption of alcoholic beverages aboard its vessels in recognition of "the overriding need for military readiness, discipline, and community safety" aboard such vessels. OPNAV Instruction 1700.16B. The guidance further states: "Numbered fleet commanders of naval and Military Sealift Command vessels participating in high-tempo, arduous operations are authorized to permit consumption of up to two 12-ounce cans or bottles of beer by each member of the crew or embarked unit during an appropriate 1-day stand down at sea. Consumption is to occur in conjunction with appropriate morale enhancing activities such as flight deck or fantail cookouts where nonalcoholic beverages must also be available." OPNAV Instruction 1700.16B. Despite this clear guidance, Defendant completely failed to enforce its own policies, and the Captain continued to consistently and flagrantly violate this policy while actively in command of the *USNS Carson City* and her crew.

83. Upon information and belief, three crew members from the *USNS Carson City* explicitly mentioned the Captain's excessive drinking to NCIS during its investigation of the Captain.

84. Despite the Captain's well-known propensity for alcohol abuse, which existed long before the voyage where Ms. Dominguez was raped, the Defendant nonetheless hired and retained the Captain as captain and master of the *USNS Carson City*. Defendant knew or should have known

that a Captain prone to intoxication posed serious risks, including to the safety of the crew members, such as Ms. Dominguez.

### C. Defendant Failed to Take Reasonable Measures to Protect Plaintiff

85. Defendant also failed to implement common-sense and industry-standard safety measures aboard the *USNS Carson City* to ensure its crew members were reasonably safe from sexual assault.

86. For example, upon information and belief, the Defendant did not have a system in place aboard the *USNS Carson City* to monitor or log when an officer used the master code to enter another crew member's stateroom. During Ms. Dominguez's voyage aboard the *USNS Carson City*, the Captain and other high-ranking officers possessed master codes that provided them with unfettered access to crew members' staterooms, including Ms. Dominguez's. There existed no system where the Captain or other high-ranking officers were required to log or record every instance that they used the master code to enter a crew member's stateroom. Nor was there a system to automatically log when a master code was used. If the Defendant had enacted a system for logging or recording the use of master codes, the Captain may have been deterred from entering Ms. Dominguez's stateroom to sexually assault her, because he would have known there would have been a permanent record of his presence in her stateroom.

87. Alternatively, the Defendant should have used physical keys rather than keypads and instituted a system where master keys were closely monitored and could only be accessed in emergencies after signing a key log. Such a system would have ensured that master keys were closely monitored and controlled. In contrast, there were no safeguards for the keypad lock master codes, like the one on Ms. Dominguez's stateroom door.

88. 46 U.S.C. § 3106(a) establishes the maritime industry requirements with respect to master key control. Section 3016(a) requires the owner of a vessel to: "(1) ensure that such vessel is equipped with a vessel master key control system, (2) establish a list of all crew, identified by position, allowed to access and use the master key and maintain such list upon the vessel, within owner records and included in the vessel safety management system; and (3) record in a log book information on all access and use of the vessel's master key, including- (A) dates and times of access; (B) the room or location accessed; and (C) the name and rank of the crew member that used the master key." Upon information and belief, the Defendant failed to implement this industry-wide safety practice.

89. As a result, the Captain was able to enter Ms. Dominguez's room using his master code without fear that his entry would be recorded or detectable.

90. In another example of the Defendant's negligence, the security cameras in the passageways leading to Ms. Dominguez's stateroom were broken for nearly a year prior to the assault. Upon information and belief, multiple work orders were submitted to the Port Engineer to repair the cameras. However, the cameras were never repaired. In fact, multiple cameras aboard the vessel were not fully functional. A few were only capable of recording and retaining 5-10 minutes of footage, while others, like the cameras in the passageways leading to Ms. Dominguez's stateroom, were entirely incapable of retaining a recording.

91. Additionally, while Defendant installed and then failed to properly maintain video cameras in passageways leading to Ms. Dominguez's stateroom, Defendant failed to even install a video camera that provided coverage of Ms. Dominguez's stateroom door. While video cameras were theoretically able to monitor the stateroom doors of some crew members, Defendant did not

provide complete video monitoring coverage of the stateroom doors of all crew members and failed to even attempt to video monitor Ms. Dominguez's stateroom door.

92. 46 USC §§ 4901(c)(1)-(2) establish U.S. maritime industry vessel requirements with respect to audio and video surveillance equipment required to be installed aboard vessels with overnight accommodations for at least 10 individuals on board. Sections 4901(c)(1)-(2) require the owner of a vessel to install video and audio surveillance equipment aboard the vessel "in passageways on to which doors from staterooms open. Such equipment shall be placed in a manner ensuring the visibility of every door in each such passageway." Upon information and belief, the Defendant failed to implement this industry-wide safety practice.

93. Despite the obvious and necessary safety features provided by operational security cameras, the Defendant did not install a camera that ensured visibility of Ms. Dominguez's stateroom door, and took no action to repair the vessel's broken cameras. If the Defendant had maintained functional security cameras in the ship's interior passageways leading to Ms. Dominguez's stateroom, and had placed a functional security camera in a place where it could monitor the outside of Ms. Dominguez's stateroom, the Captain may have been deterred from entering Ms. Dominguez's stateroom to sexually assault her because he would have known his movements were monitored, recorded, and could later be used as evidence against him.

94. In addition, the Defendant maintained an inadequate reporting system where sexual assault victims were misled about their reporting options, discouraged from reporting, and then denied the ability to make restricted reports when calling the helpline to report sexual assaults. As a result, upon information and belief, sexual assault victims have been and continue to be reluctant to step forward and report instances of sexual assault aboard U.S. Navy ships. The number of civilian mariner sexual assault victims who have contacted MSC for help after experiencing sexual

assault, only to be discouraged from moving forward with reporting, is at this point unknown. However, because victims like Ms. Dominguez are discouraged from reporting sexual assault, the statistics on the number of sexual assaults occurring on U.S. Navy ships is substantially lower than the true number. Accordingly, crew members such as Ms. Dominguez lacked notice of the potential danger of sexual assault aboard U.S. Navy ships.

95. Further, upon information and belief, while MSC policy requires annual Sexual Assault Prevention and Response ("SAPR") training aboard its ships, MSC did not provide SAPR training for the crew of the *USNS Carson City* at all in 2021 and did not hold SAPR training on the ship again until November 23, 2022. During this 2022 training, the *USNS Carson City* was under the command of its relief Captain, and the Captain was not present.

96. Because Defendant failed to institute adequate safety measures to protect crew members from sexual assault aboard its vessels, it was foreseeable that Ms. Dominguez would be sexually assaulted aboard the *USNS Carson City*.

97. The rape that Ms. Dominguez endured aboard the *USNS Carson City* was not a worker's compensation injury subject to the Federal Employees' Compensation Act ("FECA"), which "was enacted to provide for injuries to Government employees *in the performance of their duties*." *Johansen v. United States*, 343 U.S. 427, 439 (1952) (emphasis added). Ms. Dominguez was unequivocally not engaged in the performance of her work duties when she was raped in her bed, while unconscious, after a social outing and while off-duty. Further, in order to satisfy the causation needed to bring a claim under the FECA, the United States would have to argue that Ms. Dominguez *should have expected to be raped at work* when she decided to serve her country as a civilian mariner.

98. As a direct and proximate result of Defendant's negligence, Ms. Dominguez has been irreparably harmed.

**COUNT I**

**Negligence Under the Jones Act, 46 U.S.C. § 30104**

99. Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this complaint.

100. At all times material, Ms. Dominguez was employed by Defendant as a seaman, within the definition of the Jones Act, to serve as a member of the crew of the ship *USNS Carson City*, a vessel registered and documented under the law of the United States of America, which was in navigable waters on the date and time of the sexual battery and rape.

101. The United States, as owner of the *USNS Carson City*, and its agents owed Ms. Dominguez a duty to provide a safe place to work such that Ms. Dominguez could perform the job obligations in a reasonably safe manner and live aboard the vessel free from sexual violence and to follow industry standards, guidelines and other practices and materials constituting the standard of care.

102. The United States, by reason of the negligence of its agents, servants, employees, and the Master of the vessel, breached the foregoing duties, in the following respects, among others:

a. Failing to properly supervise the vessel and failing to provide a reasonably safe workplace for crew members;

b. Placing the *USNS Carson City* under the command of a Captain known to habitually abuse alcohol, including aboard the vessel, and who was prone to angry, drunken outbursts directed at crew members;

c. Failing to maintain sign-in/sign-out records for the *USNS Carson City* from December 18, 2021;

d. Failing to maintain an adequate master key control system;

e. Allowing the Captain of the vessel to have unfettered, uncontrolled, and unrestricted access to crew members' staterooms;

f. Failing to investigate or act upon written evidence that a crewmember had requested a deadbolt be installed in her room because sleeping in a room that could be accessed via master code was unsafe;

g. Failing to install security cameras sufficient to directly monitor the stateroom doors of all crew members;

h. Failing to maintain the ship's security cameras in working order and allowing the ship to sail with non-functioning cameras;

i. Failing to maintain and enforce reasonable rules and regulations regarding preventing sexual assault;

j. Failing to provide SAPR training to the crew of the *USNS Carson City* in 2021, and failing to provide SAPR training to the Captain in 2021 or 2022;

k. Instituting an inadequate system for reporting sexual assaults, whereby sexual assault victims were deterred from making reports; thereby, hiding the true danger of sexual assaults aboard U.S. Navy ships.

l. Failing to warn Ms. Dominguez of the unreasonably dangerous conditions which existed aboard the vessel;

m. Failing to provide adequate and proper medical attention and testing for Ms. Dominguez;

n. Failing to provide proper safety measures and training, and failing to properly enforce any existing safety measures;

o. Negligently hiring and/or retaining crew members who exhibited concerning behavior of dangerous propensities;

p. Failing to exercise reasonable care under the circumstances;

q. Failing to follow industry standards, guidelines, and other materials constituting the standard of care; and

r. In such other manners as shall be shown at trial of this claim.

103. As a direct and proximate result of the negligence of the United States, Ms. Dominguez suffered physical and emotional injury, pain and suffering, mental anguish, loss of capacity for the enjoyment of life, loss of future wages and earning capacity, damage to her professional prospects and reputation, and other harms and losses to be proven at trial. These losses and injuries are either permanent or continuing, and Ms. Dominguez will suffer these losses and injuries in the future.

104. Ms. Dominguez is entitled to compensatory damages, costs, interests, and pre-judgment interest, and award of any and all other applicable relief.

**COUNT II**

**Unseaworthiness Under General Maritime Law**

105. Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this complaint.

106. The United States as operator, charter, and/or owner of the *USNS Carson City* owed a duty to Ms. Dominguez to provide a vessel that was in all respects seaworthy, staunch, and fit for her intended purpose.

107. At all times material hereto, the Defendant owned, operated, maintained, or controlled the *USNS Carson City*, and employed and controlled the crew, and implemented work practices aboard the *USNS Carson City*.

108. At all times material hereto, the Defendant owed Ms. Dominguez the non-delegable duty to provide her with a seaworthy vessel upon which to work and live free from sexual assault.

109. The *USNS Carson City* was unseaworthy by reason of the following, among others:

a. The vessel was not properly supervised and failed to provide a reasonably safe workplace for crew members;

b. The *USNS Carson City* was under the command of a Captain known to habitually abuse alcohol, including aboard the vessel, and who was prone to angry, drunken outbursts directed at crew members;

c. The Defendant failed to maintain sign-in/sign-out records for the *USNS Carson City* from December 18, 2021;

d. The Defendant failed to maintain an adequate master key control system;

e. The Defendant allowed the Captain of the vessel to have unfettered, uncontrolled, and unrestricted access to crew members' staterooms;

f. The Defendant failed to investigate or act upon written evidence that a crewmember had requested a deadbolt be installed in her room because sleeping in a room that could be accessed via master code was unsafe;

g. The Defendant failed to install security cameras sufficient to directly monitor the stateroom doors of all crew members;

h. The Defendant failed to maintain the ship's security cameras in working order and allowed the ship to sail with non-functioning cameras;

i. The Defendant failed to maintain and enforce reasonable rules and regulations regarding preventing sexual assault;

j. The Defendant failed to provide SAPR training to the crew of the *USNS Carson City* in 2021, and failed to provide SAPR training to the Captain in 2021 or 2022;

k. The Defendant instituted an inadequate system for reporting sexual assaults, whereby sexual assault victims were deterred from making reports; thereby, hiding the true danger of sexual assaults aboard U.S. Navy ships.

l. The Defendant failed to warn Ms. Dominguez of the unreasonably dangerous conditions which existed aboard the vessel;

m. The Defendant failed to provide adequate and proper medical attention and testing for Ms. Dominguez;

n. The Defendant failed to provide proper safety measures and training, and failing to properly enforce any existing safety measures;

o. The Defendant negligently hired and/or retained crew members who exhibited concerning behavior of dangerous propensities;

p. The Defendant failed to exercise reasonable care under the circumstances;

q. The Defendant failed to follow industry standards, guidelines, and other materials constituting the standard of care; and

r. In such other manners as shall be shown at trial of this claim.

110. The unseaworthiness of the *USNS Carson City* and/or the unsafe workplace provided for Ms. Dominguez was the legal cause of Ms. Dominguez's injuries.

111. Ms. Dominguez in no way contributed to the unseaworthiness of the vessel.

112. As a direct and proximate result of the negligence of the United States, Ms. Dominguez suffered physical and emotional injury, pain and suffering, mental anguish, loss of capacity for the enjoyment of life, loss of future wages and earning capacity, damage to her professional prospects and reputation, and other harms and losses to be proven at trial. These losses and injuries are either permanent or continuing, and Ms. Dominguez will suffer these losses and injuries in the future.

113. Plaintiff is entitled to compensatory damages, costs, interests, and pre-judgment interest, and award of any and all other applicable relief.

## PRAYER FOR RELIEF ON CLAIMS

WHEREFORE, Plaintiff prays that this Court:

A. Award Plaintiff all of her damages under the Jones Act and General Maritime Law including back pay, front pay, and compensatory damages;

B. Award Plaintiff all attorneys' fees, costs, and expenses available under law;

C. Award Plaintiff all pre-judgment interest and post-judgment interest available under law; and

D. Award Plaintiff such additional and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all issues so triable as a matter of right.

Dated: November 29, 2023 Respectfully submitted,

David Tracey (NJ Bar # 81062013)
Andrew Macurdy (NJ Bar # 185212016)
Carolin Guentert *
**SANFORD HEISLER SHARP, LLP**
17 State Street, Suite 3700
New York, NY 10004
Telephone: (646) 402-5650
dtracey@sanfordheisler.com
amacurdy@sanfordheisler.com
cguentert@sanfordheisler.com

Christine Dunn * (Primary Contact)
Frank Tong Xu *
Shannon Henris *
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Ave. SE, Suite 300
Washington, DC 20003
Phone: (202) 499-5214
cdunn@sanfordheisler.com
fxu@sanfordheisler.com
shenris@sanfordheisler.com

J. Ryan Melogy *
**Maritime Legal Solutions, PLLC**
276 Fifth Ave., Suite 704-1454
New York, NY 10001
Phone: (347) 562-9119
maritimelegalsolutions@pm.me

* *pro hac vice to follow*

*Attorneys for Plaintiff*